## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GARY LEEMAN**<br>1027 Old Bridge Road #12<br>Port Carling, ON P0B 1JO Canada | ) ) ) ) |
| **BRADLEY AITKEN**<br>40230 Summerhill Road, RR1<br>Clinton, ON N0M 1L0 Canada | ) ) ) ) |
| **DARREN BANKS**<br>9599 W. Charleston Blvd, Apt. 1017<br>Las Vegas, NV 89117-6656 | ) ) ) ) |
| **CURT BENNETT**<br>260 Awapuhi Pl.<br>Wailuku, HI 96793-2117 | ) ) ) ) |
| **RICHARD DUNN**<br>12229 Clarence Center Rd.<br>Akron, NY 14001-9337 | ) ) ) ) |
| **WARREN HOLMES**<br>201 E. Summer Haze Circle<br>The Woodlands, TX 77382-5516 | ) Civil Case No. 13-CV-1856<br>) **JURY TRIAL DEMANDED** ) |
| **ROBERT MANNO**<br>5070 Drummond Rd.<br>Niagara Falls, ON L2E 6E4 Canada | ) ) ) ) |
| **BLAIR JAMES STEWART**<br>700 Washington Square Dr.<br>Leander, TX 78641-2269 | ) ) ) ) |
| **MORRIS TITANIC**<br>146 Delta Road<br>Amherst, NY 14226-2044 | ) ) ) ) |
| **RICHARD VAIVE**<br>574 Blenheim Crescent<br>Oakville, ON L6J 6P6 Canada | ) ) ) ) |
| **on their behalf and others similarly situated,** | ) ) |
| Plaintiffs, | ) |

```
        v.                              )
                                        )
NATIONAL HOCKEY LEAGUE                  )
1185 Avenue of the Americas,            )
New York, New York 10036                )
                                        )
NHL BOARD OF GOVERNORS                  )
1185 Avenue of the Americas,            )
New York, New York 10036                )
                                        )
              Defendants.               )
_____  )
```

## CLASS ACTION COMPLAINT

Plaintiffs, by and through undersigned counsel, bring this Complaint against the Defendants, the National Hockey League and the National Hockey League Board of Governors (collectively "NHL"), and allege upon facts and information and belief as follows.

## INTRODUCTION

1.      This action arises from the pathological and debilitating effects of brain injuries caused by concussive and sub-concussive impacts sustained by former NHL players during their professional careers.

2.       Every blow to the head is dangerous.  Both repeated concussions and sub-concussions cause permanent brain damage.  During practice and games, a player can sustain close to one thousand or more hits to the head in one season without any documented incapacitating concussion.  Such repeated blows result in permanently impaired brain function.

3.      Unbeknownst to Plaintiffs, scientific evidence has linked brain injuries to long-term neurological problems for decades.  While every blow to the head is dangerous, Plaintiffs did not know, and were not told by the NHL, how dangerous this repeated brain trauma is.

4.      The NHL has known or should have known of this growing body of scientific evidence and its compelling conclusion that hockey players who sustain repetitive concussive

2

events, sub-concussive events and/or brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities both during their hockey careers and later in life.

5.     Eighty-five years ago, pathologist Harrison Martland published his seminal study in the Journal of the American Medical Association linking sub-concussive blows suffered by boxers to injuries ranging from mild concussions to degenerative brain disease.

6.     Scientists and doctors in the United States and across the world have since published scores of peer-reviewed articles in well-established medical and scientific journals conclusively establishing the link between brain injuries and sub-concussive/concussive blows suffered by, among others, hockey players.

7.     Despite this mounting evidence of which the NHL knew or should have been aware, the NHL took no remedial action to prevent its players from unnecessary harm until 1997 when it created a concussion program (the "Concussion Program") ostensibly to research and study brain injuries affecting NHL players.

8.     In 1997 – the first year of the Concussion Program – the NHL initiated baseline brain testing for its players and required its team doctors and trainers to maintain records of all players believed to have suffered concussions.  This data was then used to study concussions from 1997 through 2004.

9.     During this study period, the NHL voluntarily inserted itself into the scientific research and discussion concerning the link between brain injuries sustained by NHL players and short-term and long-term impairment of the brain by publicly maintaining that the Concussion Program was analyzing the concussion data.  Yet the NHL took no action to reduce the number and severity of concussions among its players during that period and Plaintiffs relied on the NHL's silence to their detriment.

3

10.     By voluntarily inserting itself into this research and public discourse, the NHL gratuitously undertook a responsibility: (a) to make truthful statements; (b) to initiate rules, protocols or programs to deal with the mounting evidence of brain injuries among former players and the incidence of concussions and sub-concussive events among present players; (c) not to continue complacently with the same conduct that nurtured violent head trauma while advancing the NHL's financial and political interests; and (d) to inform all former players, and then-current players, of the risks of concussive events, sub-concussive events and/or brain injuries.

11.     After voluntarily assuming a duty to investigate, study, and truthfully report to the NHL players, including the Plaintiffs, the medical risks associated with hockey and brain injuries, the Concussion Program did nothing until 2011 – 14 years after it started – when it finally issued a report.  That report, however, discussed only the number of concussions in the NHL for the regular seasons from 1997 – 2004, seven years before it came out.

12.     Despite the mountain of evidence connecting hockey to brain injuries, NHL Commissioner Gary Bettman subsequently stated that more study on the issue is necessary.  In short, the NHL chooses to ignore the medical findings of its own studies, other sports or the general practice of medicine regarding brain injuries and hockey.

13.     Moreover, the NHL itself did nothing to protect its players from unnecessary harm until 2010 – 13 years after the Concussion Program started – when it modified its so-called Rule 48 regarding body checking, a modification that according to a 2013 article published by University of Toronto researchers had essentially no effect on the rate of concussions suffered by NHL players during the three seasons in which the proposed safety measure was in place.

14.     Between 1996 and 2011 when the NHL was looking at the data, many NHL players were forced to retire due to the lingering effects caused by concussions.  Some of them

include: 1996 – Brett Lindros and Dean Chynoweth; 1997 – Stanley Cup Champion Nick Kypreos and Dennis Vaske; 1998 – Hall of Famer Pat LaFontaine; 1999 – Stanley Cup Champions Geoff Courtnall and Jeff Beukeboom; 2001 – Stu Grimson, nicknamed the "Grim Reaper," and Stanley Cup Champion and Olympian Peter Svoboda; 2002 – Gino "Chief, The Enforcer" Odjick; 2003 – Stanley Cup Champion and Hall of Famer Mike Richter; 2004 – Steve Moore, who suffered career-ending injuries in a fight on the ice with Todd Bertuzzi, and Hall of Famer and Conn Smythe Trophy Winner Scott Stevens; 2005 – Olympian and Stanley Cup Champion Adam Deadmarsh; 2006 – All Star Keith Primeau; 2007 – Matthew Barnaby, and perennial All-Star and Hart Memorial Trophy winner Eric Lindros; and 2011 – Stanley Cup Champion Marc Savard and Hart Trophy Winner and Olympian Chris Pronger.

15.    The NHL's active and purposeful concealment of the severe risks of brain injuries exposed players to unnecessary dangers they could have avoided had the NHL provided them with truthful and accurate information and taken appropriate action to prevent needless harm. Many of the players, including Plaintiffs, sustained repetitive brain injuries while in the NHL and now suffer from latent or manifest neuro-degenerative disorders and diseases, all of which, in whole or in part, were caused by the NHL's acts and/or omissions.

16.    The NHL caused or contributed to the injuries and increased risks to Plaintiffs through its acts and omissions by, among other things: (a) historically ignoring the true risks of concussive events, sub-concussive events and/or brain injuries suffered by NHL hockey players; (b) failing to disclose the true risks of repetitive brain injuries to NHL players; (c) refusing to address the issue of brain injuries despite a growing body of medical opinion establishing such a linkage and their own study of the issue; and (d) refusing to amend its rules and procedures and equipment requirements effectively to protect its players, including Plaintiffs.

5

17.     The NHL persists in this conduct to date by, among other things, refusing to ban fighting and body checking and by continuing to employ hockey players whose main function is to fight or violently body check players on the other team ("Enforcers").

18.     The time has come for the NHL to elevate long-term player safety over profit and tradition.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class consists of more than one hundred persons, the overall amount in controversy exceeds $5,000,000 exclusive of interest, costs, and attorney's fees, and at least one Plaintiff is a citizen of a State different from one Defendant.  The claims can be tried jointly in that they involve common questions of law and fact.

20.     This Court has personal jurisdiction over the NHL because it does business in the District of Columbia, operates a franchise, the Washington Capitals, in this District, and derives substantial revenue from its contacts with the District of Columbia.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are entities with the capacity to sue and be sued under their common name and reside, as that term is defined at 28 U.S.C. §§ 1391(c)(2) and (d), in this District where they operate a franchise.

## PARTIES

## I.     THE CLASS REPRESENTATIVES HAVE SUFFERED SERIOUS INJURIES.

22.     Plaintiff Bradley Aitken is a representative for the putative class as defined herein.  As of the commencement of this action, he is a resident of Ontario, Canada.  Mr. Aitken played center and was an Enforcer for the Pittsburgh Penguins from 1987-88 and in 1990 and for the Edmonton Oilers in 1991.  Mr. Aitken sustained repeated head trauma and suffered multiple

concussions and sub-concussive impacts as a result of his playing professional hockey in the NHL. Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to depression, personality change, memory loss, lack of concentration, severe headaches, and post-traumatic head syndrome.

23.     Plaintiff Darren Banks is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of Nevada. Mr. Banks played left wing and was an Enforcer for the NHL's Boston Bruins from 1992-94. He suffered multiple concussions and sub-concussive impacts as a result of his playing professional hockey in the NHL. Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to post-traumatic head syndrome and post-traumatic headaches.

24.     Plaintiff Curt Bennett is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of Hawaii. Mr. Bennett played forward for the St. Louis Blues in 1970 and 1972 and from 1977-79; the New York Rangers in 1972, and the Atlanta Flames from 1972-77 and 1979-80. Mr. Bennett suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL. Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to cephalgia, visual problems, tinnitus, lightheadedness, memory loss, bilateral hearing loss, post-traumatic head syndrome, and cognitive deficit.

25.     Plaintiff Richard Dunn is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of the State of New York. Mr. Dunn was a defenseman for the Buffalo Sabres from 1977-82 and 1985-89; the Calgary Flames from 1982-83. Mr. Dunn suffered multiple sub-concussive impacts as a result of his playing

professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such sub-concussive impacts, including but not limited to blurred vision, memory loss, post-traumatic headaches, and cognitive deficit.

26.     Plaintiff Warren Holmes is a representative for the putative class as defined herein.  As of the commencement of this action, he is a resident of Texas.  Mr. Holmes played center for the Los Angeles Kings from 1981-84.  He suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to post-traumatic head syndrome, sleep disorder, and memory loss.

27.     Plaintiff Gary Leeman is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of Ontario, Canada.  Mr. Leeman played defenseman and then forward for the Toronto Maple Leafs from 1983-92, the Calgary Flames from 1992-93; the Montreal Canadians from 1993-94; the Vancouver Canucks in 1994-95, and the St. Louis Blues in 1996.  Mr. Leeman suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to post-traumatic head syndrome, headaches, memory loss, and dizziness.

28.     Plaintiff Robert Manno is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of Ontario, Canada.  Mr. Manno was a defenseman for the Vancouver Canucks from 1976-81; the Toronto Maple Leafs from 1981-82; and the Detroit Red Wings from 1983-85.  Mr. Manno suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts,

including but not limited to post-traumatic head syndrome, memory loss, and a lack of concentration.

29.     Plaintiff Blair James Stewart is a representative for the putative class as defined herein.  As of the commencement of this action, he is a resident of Texas.  Mr. Stewart played center and left wing for the Detroit Red Wings from 1973-75; the Washington Capitals from 1975-79, and the Quebec Nordiques from 1979-80.  Mr. Stewart suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to post-traumatic head syndrome, post-traumatic headaches, and sleep disorder.

30.     Plaintiff Morris Titanic is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of the State of New York.  Mr. Titanic played left wing for the Buffalo Sabres from 1974-76.  Mr. Titantic suffered multiple concussions and sub-concussive impacts as a result of his playing professional hockey in the NHL.  Since his retirement, he has suffered from injuries associated with such concussions and sub-concussive impacts, including but not limited to memory loss, tinnitus, post-traumatic headaches, post-traumatic head syndrome, and cognitive deficit.

31.     Plaintiff Richard Vaive is a representative for the putative class as defined herein. As of the commencement of this action, he is a resident of the Province of Ontario, Canada.  Mr. Vaive played right wing for the Vancouver Canucks from 1979-80; the Toronto Maple Leafs from 1980-87; the Chicago Blackhawks from 1987-88, and the Buffalo Sabres from 1988-92. Mr. Vaive sustained suffered multiple concussions and sub-concussive impacts as a result of playing professional hockey in the NHL.  Since his retirement, Mr. Vaive has suffered from

injuries associated with such concussions and sub-concussive impacts, including but not limited to cephalgia, tinnitus, lightheadedness, depression, and memory loss.

## II.     THE STATUTE OF LIMITATIONS IS TOLLED.

32.     As a result of their playing professional hockey in the NHL, all of the aforementioned Plaintiffs experienced brain trauma and/or injury such as concussions, post-concussion syndrome, second-impact syndrome, and/or long-term brain damage.  Since their retirement, each Plaintiff has experienced neurological symptoms, including but not limited to those described above.  Plaintiffs' symptoms arise from injuries that are latent and have developed and continue to develop over time.  Each Plaintiff is also at increased risk of latent brain injury and, therefore, is in need of medical monitoring.

33.     Plaintiffs were not warned about the dangers of returning to play after suffering a concussive or sub-concussive impact.

34.     Plaintiffs were not warned about the risk of long-term injury due to hockey-related concussions.

35.     Those failures on the part of the NHL constitute substantial factors in causing Plaintiffs' current injuries.

36.     The NHL, in the course of its business, omitted material key facts about the effects of head injuries that prevented Plaintiffs from discovering a link between their premature return to action and head injuries.

37.     The NHL was under a continuing duty to disclose the true character, quality, and nature of the after-effects of concussive events, sub-concussive events and/or brain injuries. Because of the NHL's concealment of the true character, quality and nature of these injuries, it is estopped from relying on any statute of limitation defense.

38.     The applicable statute of limitations is tolled because the NHL's fraudulent concealment of the dangers and adverse effects of head injuries prevented Plaintiffs from learning of the hazards of their health.

III.     **DEFENDANTS ARE RESIDENTS OF THIS JUDICIAL DISTRICT.**

39.     Defendant NHL, which maintains its offices at 1185 Avenue of the Americas, New York, New York, 10036, is an unincorporated association consisting of separately-owned and independently-operated professional hockey teams that operate out of many different cities and states within this country and Canada. The NHL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional hockey league in the United States.

40.     As an unincorporated association of member teams, the NHL is a resident of each state in which its member teams reside, including the District of Columbia where the NHL operates the Washington Capitals.

41.     Defendant NHL Board of Governors is the ruling and governing body of the NHL.  Each team appoints a Governor and two alternates to the Board.  The current chairman is Boston Bruins owner Jeremy Jacobs.  The NHL Board of Governors exists to establish the policies of the NHL and to uphold its constitution.  Some of its responsibilities include reviewing and approving any rule changes to the game and hiring and firing of the NHL commissioner.

**GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

I.     **LITERATURE HAS LINKED SPORTS AND CONCUSSIONS FOR DECADES.**

42.     Beginning in the 1920s, respected, peer-reviewed publications have chronicled the ever-increasing links that doctors and scientists have made between brain injuries and participation in certain sports, including hockey.

A.     **Athletes Can Sustain Different Types of Brain Injuries.**

43.     The medical community generally recognizes four types of sports-related brain injuries: (a) concussion and sub-concussive events; (b) post-concussion syndrome; (c) second-impact syndrome; and (c) long-term brain damage.

44.     Concussion, the first type of injury, is a term used interchangeably with mild traumatic brain injuries ("MTBI").  This injury consists of trauma to the head and a resulting transient loss of normal brain function.  Loss of normal brain function can include dozens of symptoms, including dizziness, headache, blurred vision, and nausea.

45.     Dr. Robert Cantu of the American College of Sports Medicine, a widely-respected authority on brain injuries, first defined different grades of concussions in 1986, which he later updated in 2001.  The three common "grades" are:

- <u>Grade 1</u>: brain injury with no loss of consciousness and post-traumatic amnesia from 0 – 30 minutes;

- <u>Grade 2</u>: loss of consciousness for less than five minutes or post-traumatic amnesia for 30 minutes to 24 hours; and

- <u>Grade 3</u>: loss of consciousness of greater than five minutes or amnesia for greater than 24 hours.

46.     Post-concussion syndrome, which may last days to years after someone suffers a concussion, generally involves depression, irritation, poor concentration, memory loss, mood swings, headaches, impaired speech and/or balance, dizziness, seizures, blurred vision, or general malaise.

47.     As with concussions/MTBI, only rest can resolve these symptoms.

48.     Second-impact syndrome occurs when an athlete still healing from a prior concussion experiences a second, force-related event to the brain.  Second-impact syndrome can lead to comas, permanent brain-function loss, or death.

49.     Long-term brain damage includes Alzheimer's disease, dementia, and chronic traumatic encephalopathy ("CTE").

50.     CTE, a catastrophic disease once associated only with boxers, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to severe depression or dementia.  It can only be confirmed through an autopsy.

51.      In January 2010, the Boston University School of Medicine Center for the Study of Traumatic Encephalopathy ("BUSM") announced for the first time that a former hockey player, New York Ranger Reggie Fleming, had been diagnosed with CTE.

52.     Subsequently, Rick Martin, best known for being part of the Buffalo Sabres' French Connection, was diagnosed with CTE.  Martin was the first documented case of a hockey player not known as an Enforcer to have developed CTE.  Martin is believed to have developed the disease primarily from a severe concussion he suffered in 1977 while not wearing a helmet.

53.     Within months of Martin's death, the deaths of four hockey Enforcers – Derek Boogaard from a combination of too many painkillers and alcohol; Rick Rypien, an apparent suicide; Wade Belak, who like Rypien had reportedly suffered from depression; and Bob Probert, best known as one-half of the "Bruise Brothers" with then-Red Wing teammate Joey Kocur, all of whom had a record of fighting, blows to the head and concussions – led to more concerns about CTE and hockey.  BUSM doctors subsequently confirmed that Boogaard and Probert had CTE.

**B.     The Medical Community Made the Link Between Sports and Brain Injuries 85 Years Ago.**

54.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of [boxers] ... if they ke[pt] at the game long enough."

Martland's study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

55.    In 1948, the New York legislature created the Medical Advisory Board of the New York Athletic Commission to establish mandatory rules to prevent or minimize health risks to boxers.  After a three-year study, the Medical Advisory Board recommended, among other things: (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow-up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy;" (e) a physician's prerogative to recommend that a boxer surrender temporarily his license if the physician notes that he suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

56.    The recommendations were later codified as rules of the New York State Athletic Commission.

57.    In or about 1952, the Journal of the American Medical Association published a study of encephalopathic changes in professional boxers.

58.    In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

59.    A 1963 study by Drs. Mawdsley & Ferguson found that some boxers sustain chronic neurological damages as a result of repeated head injuries.  This damage manifested in the form of dementia and impairment of motor function.

60.     In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the neurological impact of boxing.  This study outlined the neuro-pathological characteristics of Dementia Pugilistica, including loss of brain cells, cerebral atrophy, and neuro-fibrillary tangles.

61.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

62.     In the early 1980s, University of Virginia's Department of Neurosurgery published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

63.     In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI also suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

64.     From the early 1950s to the mid-1990s, numerous additional studies were published in medical journals including the Journal of the American Medical Association, Neurology, the New England Journal of Medicine, and Lancet warning of the dangers of single concussions, multiple concussions, and/or head trauma from multiple concussions.  These studies collectively established that repetitive head trauma in contact sports, including hockey, has potentially dangerous long-term effects on brain function; encephalopathy (Dementia Pugilistica)

15

is caused by repeated sub-concussive and concussive blows to the head; with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career; immediate retrograde memory issues occur following concussions; mild head injury requires recovery time without risk of subjection to further injury; head trauma is linked to dementia; and minor head trauma can lead to neuro-pathological and neuro-physiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

65.    In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease, Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

### C.    Since the Early 1990s, the Medical Community and Others Have Focused on Brain Injuries Suffered by Hockey Players.

66.    By 1991 the NCAA and individual college teams' medical staffs, along with many pre-college groups, had disseminated information and adopted criteria to protect hockey players even remotely suspected of having sustained concussions.  Many NHL players (and especially those from Canada), however, never play in the NCAA, instead going straight from junior leagues to the NHL.

67.    Subsequently, four "International Symposia on Concussion in Sport" have convened.  Attendees at these prestigious conferences have included American doctors who are experts on the brain and concussions.  The conferences took place in Vienna (2001), Prague (2004) and twice in Zurich (2008 and 2012).

68.    Flowing from the 2001 conference were two reports focused specifically on hockey.  The first, titled "Procedures After Minor Traumatic Brain Injury mTBI In Ice Hockey to Prevent Neurological Sequelae," noted that since 1986, doctors worldwide had observed "an

alarming increase in the rate of MTBI in ice hockey despite improved protective gear."  In the NHL specifically, the proportion of MTBI had increased from 2% in the 1989-90 season to 8% in 1999-2001 seasons.  The report recommended that "any confused player with or without amnesia should be taken off the ice and not be permitted to play again for at least 24 hours."

69.     The second report, titled "Concussion Experience: Swedish Elite Ice Hockey League," noted that in "the beginning of the 1980s, very few physicians engaged in ice hockey were aware of the seriousness of" concussions.  Studies of Sweden's elite ice hockey league from the 1980s onward showed an "alarming" increase in the number of concussions being suffered by the players that the authors attributed to "[t]oday's ice hockey [being] faster and more physical."  The authors also noted "a need for further research in order to find the accurate way to prevent and treat these injuries."

70.     The 2004 conference coined the phrase "when in doubt, sit them out" while repeating the 2001 conference's recommendation that players who show any signs of concussions should not be allowed to return to play in the current game or practice.  The 2004 conference adopted a step by step return to play procedure.

71.     The 2004, 2008 and 2012 conferences contained detailed protocols on examining a player believed to have suffered a concussion.  The 2008 conference recommended that a doctor conduct the assessment of whether a player had a concussion or not.  At the 2012 conference, an abstract was presented on "Acute Clinical Signs and Outcome of Concussion in National Hockey League Players," which concluded that concussions "can produce a spectrum of acute on-ice clinical signs."

72.     Members of the NHL Concussion Program attended all four conferences.

73.     In North America, researchers have also focused on hockey and brain injuries. For the 2009-10 season, Dr. Paul Echlin followed two junior hockey clubs to assess their incidence of concussions.   The report concluded that 25% of the players on the teams experienced at least one concussion in a 52-game season.  Twenty-nine per cent of those players endured recurring concussions.  Dr. Echlin stated that concussions occurring in hockey may be seven times higher than reported in the-then current literature.

74.     In addition, the Mayo Clinic has sponsored two "Conferences on Concussions in Hockey," the first in 2010 and the second in 2013.   Recommendations made at the first conference influenced the NHL to penalize targeted hits to the head and change its medical protocols to require an off-ice player evaluation.   The 2013 recommendations focused on eliminating hockey fights in the NHL by requiring immediate ejections for fighting.

75.     The 2010 conference proved influential in establishing standards for concussion evaluation and treatment, persuading USA Hockey and Hockey Canada to raise the minimum age for body checking to 13 and broadening concussion education among players and coaches.

76.     At the 2013 conference, Dr. Michael Stuart, a director of the Mayo Clinic Sports Medicine Center and chief medical officer for USA Hockey, noted two recent fights that occurred on September 22, when Buffalo's Corey Tropp sustained a concussion, and October 1, when Montreal's George Parros was knocked unconscious.   Those injuries underscored presenters' demands for significant modifications in body checking and an end to fighting.

77.     As Ken Dryden, a Hall of Fame Canadiens goalie, six-time Stanley Cup champion, former president of the Toronto Maple Leafs, and former member of the Canadian Parliament, said at the 2013 conference, "[s]cience has responded to the game on the ice.  Now, it's time for the game to respond to the science."

II.    **AS THE "FACE OF THE GAME" AND SELF-APPOINTED SAFETY ARBITER, THE NHL MUST PROTECT ITS PLAYERS FROM UNNECESSARY HARM.**

    A.    **The NHL Governs and Promotes Professional Hockey and Is the Most Recognizable Professional Hockey League in the World.**

78.    The NHL generates approximately $3,300,000,000 in gross income per year and oversees America's most popular hockey league, acting as a trade association for the benefit of the thirty independently-operated teams.  The NHL's average attendance per game in 2012-13 was 17,760, 97% of capacity.

79.    The NHL has, since its inception in the first half of the twentieth century, governed and promoted professional hockey and as referenced in detail herein, was created and established to act as the governing body of the sport.

80.    The NHL generates revenue mostly through marketing sponsorships, licensing merchandise, and selling national broadcasting rights to the games.  The teams share a percentage of the League's overall revenue.

81.    The NHL earns billions of dollars from its telecasting deals with, *inter alia*, NBC and its own NHL Network and, in Canada, CBC, TSN and MDS.

82.    The NHL in 2011 negotiated a television deal with NBC for 10 years and $2,000,000,000, or $6,600,000 per team per year, from the United States market alone.  In Canada, the NHL deal with the CBC and the TSN cable network will expire after this season. CBC expects to pay considerably more than its current multi-year $100,000,000 deal.

83.    Over many decades, the NHL's influence has expanded through its use of the media.  For example, through NHL films, www.NHL.com, and video games, the NHL has promoted its brand of hockey via every mass communication medium available, making the NHL the most recognizable hockey league in the world.

84.     In the upcoming Sochi 2014 Winter Olympics, the NHL will suspend the season as it has done for decades to allow its marquee players to represent national teams, further spreading its influence around the globe.

**B.      Through Its Mass Media Appeal, the NHL Has Promoted a Culture of Violence.**

85.     For decades, the NHL has nurtured a culture of violence.  Films such as *Slapshot*, *The Last Gladiators*, *Goon, Youngblood* and others reflect this NHL-inspired culture.  The public statements of Don Cherry and the use of highlights on such sites as www.hockeyfights.com and his video series *Don Cherry's Rock'em, Sock'em Hockey* are further examples of this violence-centered culture promoted by the NHL.

86.     NHL Films, an agent and instrumentality of the NHL devoted to producing promotional films, has created numerous highlight features that focus solely on the hardest-hits that take place on the ice.  These featured videos are marketed and sold to advance the NHL's culture of violence as entertainment.

87.     In addition, NHL-sponsored video games include fighting and vicious body checking.  Video game players also add virtual Enforcers to their team rosters to ensure their players will not be intimidated by the simulated violent tactics of the opposition.

88.     This is part of the overall culture in which NHL players are encouraged to play despite an injury, in part because failure to do so creates the risk of losing playing time, a starting position, demotion to the minors and the abrupt end to a career.

89.     Within this culture, the NHL purposefully profits from the violence they promote.

90.     This attitude has existed for decades and continues to the present date, with players lauded for their "head hunting" and fighting skills.

**C.**     **While at the Same Time Promoting a Culture of Violence by Which it Profits, the NHL Has Voluntarily Become the Arbiter of Player Safety.**

91.     For decades, the NHL voluntarily instituted programs purportedly to support player health and safety on and off the ice, and the players and their families looked to the NHL for guidance on these issues and to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

92.     Since its inception, the NHL received and paid for advice from medical consultants regarding health risks associated with playing hockey, including the health risks associated with concussive and sub-concussive injuries.  Such ongoing medical advice and knowledge placed the NHL in a position of superior knowledge to the players.  Combined with the NHL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NHL at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

93.     As a result, the NHL unilaterally assumed a duty to act in the best interests of the health and safety of NHL players, to provide truthful information to NHL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

94.     The NHL's voluntary actions and authority throughout its history show that as early as the 1920s, the NHL shouldered the duty to make the game of professional hockey safer for the players and to keep the players informed of safety information they needed to know.

95.     The NHL's historical actions have continued through the decades.  For example, in 1979, the NHL mandated that all hockey players wear helmets.  At the time the rule was created, approximately 70% of NHL players were wearing helmets as a result of the 1968 death of Bill Masterson from head trauma during an NHL game.  The 1979 rule, however,

grandfathered all then current players from the mandated helmet rule; the last person to play without a helmet, Craig MacTavish, retired in 1996.

96.     As a result of its position of authority and repository of a composite of information throughout the League, the NHL knew how to protect its players from dangerous circumstances and took unilateral, but insufficient, measures to do so.

97.     Thus, since its inception and continuing into the present, the NHL has been in a position that affords it a special relationship to NHL players.  For that reason, from its inception and continuing into the present, the NHL owed a duty of reasonable care to keep NHL players informed of neurological risks, to inform NHL players truthfully, and not to mislead NHL players about the risks of permanent neurological damage that can occur from MTBI incurred while playing hockey.

## III.    NOTWITHSTANDING DECADES OF EVIDENCE ON BRAIN INJURIES AND ITS ROLE AS SAFETY ARBITER, THE NHL FAILED TO ACT UNTIL 1997.

98.     For decades, the NHL has been aware or should have been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

99.     Indeed, since the NHL has permitted bare-knuckle, on-ice fighting from its inception to the present, the NHL knew or should have known that the nearly century-old data from boxing was particularly relevant to professional hockey.  And given the higher speed of skating compared to running, the NHL also knew or should have known that the decades-long data from football was particularly relevant to professional hockey.

100.    Despite its unilateral duty and power to govern player conduct on and off the ice, the NHL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in

players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

101.    Rather than take immediate measures to protect NHL players from these known dangers, from the time it first knew of these problems through the 1990s, the NHL did nothing.

102.    Finally, in 1997, NHL Commissioner Gary Bettman agreed to fund a committee to study the issue of head injury in the NHL. The NHL voluntarily proceeded to form a "Concussion Program" to study the issue.  This Program voluntarily undertook the responsibility of studying the effects of concussions and sub-concussive injury on NHL players.

103.    With the Concussion Program, the NHL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.   Through its voluntary creation of the Concussion Program, the NHL affirmatively assumed a duty to use reasonable care in the (a) study of concussions and post-concussion syndrome in NHL players; (b) study of any kind of brain trauma relevant to the sport of hockey; (c) use of information developed; and (d) publication of data and/or pronouncements from the Concussion Program.

## IV.    INSTEAD OF TRULY ACTING, THE NHL SAT ON THE BENCH FOR ANOTHER 14 YEARS.

104.    Rather than exercise reasonable care in these duties, the NHL immediately engaged in a long-running course of fraudulent and negligent conduct so as to maintain and improve its economic advantage, which included failing to make any statements of substance on the issue while claiming to need more data and delaying for 14 years the publication of a report which didn't mention MTBI and which was designed to: (a) ignore accepted and valid neuroscience regarding the connection between repetitive traumatic concussive events, sub-concussive events and/or brain injuries, and degenerative brain disease such as CTE, and (b)

create a climate of silence by which the NHL implied that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

105.    The NHL's unparalleled status in the world of hockey imbued its silence on the issue with a unique authoritativeness as a source of information to players.  Plaintiffs therefore reasonably relied on the NHL's silence on this vital health issue as an indication that concussions were not dangerous.

106.    The NHL publicized the Concussion Program as being independent from the NHL, consisting of a combination of "independent" doctors and researchers.

107.    The Concussion Program was not independent.  It consisted of persons already affiliated with the NHL.

108.    From 1997 until the present, the Concussion Program has produced one report, released on May 17, 2011, that discussed the incidence of concussions in seasons ending in 2004. To date, the Concussion Program has taken no public position on the long-term effects of concussions.  The NHL continues to respond to inquiries on the subject by saying that further research is required.

109.    Plaintiffs relied to their detriment on the NHL's silence, which ignores the findings of the independent scientists who had studied the issue including Drs. Guskiewicz, Cantu, Omalu, and Bailes regarding the causal link between multiple head injuries and concussions and cognitive decline.

## V.    AT THE SAME TIME IT WAS SUPPOSEDLY STUDYING BRAIN INJURIES, THE NHL MADE CHANGES TO THE GAME THAT ADVERSELY AFFECTED ITS PLAYERS.

110.    In 1996, the NHL changed the glass in all of its arenas from the flexible glass historically used to rigid glass.  Despite immediate complaints from players that the rigid glass

was like hitting a brick wall, the NHL did not fully return to flexible glass until 2011. During that 15-year period (during which the Concussion Program was operating) the NHL was reluctant to incur the cost of replacement that would have helped reduce the incidence of brain injuries suffered by its players.

111. In 2005, despite knowing that it would result in **_more_** concussions, which it already knew was a problem, the NHL decided to make its game faster and more appealing by penalizing "clutch and grab" hockey whereby players hook and hold each other to slow down the game. The game did in fact speed up and became more popular, resulting in increased revenue. However, the change also meant there were more high speed collisions. From 1997 until 2008, an average of 76 players per year suffered a concussion on the ice. For the 2011-2012 season, 90 players suffered a concussion on the ice at a loss of 1,779 man games.

## VI.  FINALLY IN 2010, THE NHL BEGINS TO CATCH UP WITH OTHER HOCKEY LEAGUES AND TAKE SUBSTANTIALLY INEFFECTIVE ACTION TO PROTECT ITS PLAYERS.

112. The first significant rule change designed to ameliorate the incidence of concussions did not occur until 2010, when Rule 48 was amended to make body checking with the head a penalty.

113. In 2011, Rule 41 was changed to penalize players who fail to avoid or minimize contact with a defenseless opponent along the boards but gave the referee the discretion not to call a penalty if the contacted player had put himself in a vulnerable position.

114. That same year, Rule 48 was again amended to make all intentional hits to the head a penalty.

115. Almost all the other hockey leagues around the world had adopted a similar rule years earlier. A report entitled "Bodychecking Rules and Concussion in Elite Hockey" by Dr.

Michael Cusimano and his colleagues, published in 2013, has concluded that the changes in Rule 48 have had a negligible effect on the incidence of NHL concussions.

116.    Also, it was not until 2011 that the NHL required a doctor, rather than a trainer, to examine its players for a concussion after an on-ice head trauma.  The trainers usually performed these examinations on the bench or on the ice in the arena.  As of March 16, 2011, the NHL changed its concussion protocols to require an examination off the ice and bench (often referred to as a quiet room) by a doctor (but not a neurosurgeon).  The player could return to the ice if he was symptom free, returned to his brain baseline and passed the SCAT2 test, notwithstanding that the general medical standard for return from concussion had been set as early as 2001, and certainly by the Prague convention in 2004, as "when in doubt, sit them out" – a mandate to prevent a concussed player from returning to the game.

117.    In 2011, the NHL created a Department of Player Safety, which proposes rule changes to enhance safety, reviews safety issues relating to equipment and environment and suspends players as a disciplinary matter.  To date, player suspensions seem to be the Department's only recommendation since its inception.

118.    On July 23, 2013, the NHL changed its concussion protocols to require that a concussed player could not return to the same game in which the concussion occurred, finally adopting the 2004 standard.  This change occurred following a number of incidents in which high profile players returned to a game and then missed significant playing after the game with severe post-concussions effects.

119.    To date, the NHL does not require a neurosurgeon to be available at its games.

120.    Many experts agree that the number of NHL concussions are still significantly under-reported.

121.    In 2013, the NHL required players to wear visors but grandfathered its veteran players.  The NHL has recently mandated the use of "soft" shoulder pads.  At the same time, the NHL adopted a rule penalizing players who remove their helmets in an on-ice fight.  However, Rule 46.1 stills allows on ice fighting.  Bill Daly, the NHL's Deputy Commissioner, was quoted on October 9, 2013 as saying that "[r]ule changes that impact and reduce the role of fighting in the game have been, and I expect will continue to be, made over time, as and when they are deemed appropriate.  The mandatory visor rule and the rule prohibiting the removal of helmets during fights were two such rules that were implemented just this past summer.  I do not expect that we will change our traditional approach to how rules are changed and implemented in the game at any time in the foreseeable future."

## VII.    THE NHL HAS DONE TOO LITTLE, TOO LATE.

122.    In 2008, Boston University's Dr. Ann McKee (who performed the Fleming autopsy in 2010) stated that "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

123.    The NHL knew or should have known of that evidence for decades.

124.    The NHL knew or should have known that for decades, legions of hockey players, including some of the stars of the game, have been forced to retire because of concussions.

125.    The NHL knew or should have known that the biometrics of its players were changing; that its players were getting bigger and stronger, meaning that their collisions were becoming more fierce and their fights fraught with greater peril.

126.    The NHL knew or should have known that the change from flexible to rigid glass would have an adverse impact on its players.

127.     The NHL knew or should have known that getting rid of clutch and grab hockey would speed up the game, further increasing the fierceness of on-ice collisions.

128.     In spite of what the NHL knew or should have known, it failed to act in a timely manner.

129.     Why the NHL (and its Concussion Program) failed to share accurate information and take appropriate actions is difficult to comprehend since the NHL has known or should have known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms and that its players were retiring and dying due to concussions and MTBI.  Instead, the NHL's silence and insistent on the need for more data has misled players, coaches, trainers, and the public and impliedly spread disinformation.

130.     Why the NHL changed the glass and sped up the game at the same time it was purportedly reviewing brain injuries is similarly difficult to comprehend.

131.     The NHL has essentially refused for decades to address the issues of concussions and sub-concussive events and their long-term effects on NHL players.  The NHL's conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large.  At a minimum, the NHL acted with callous indifference to the duty it voluntarily assumed to the Plaintiffs and players at every level of the game.

132.     As a direct result of the fraudulent concealment by the NHL, former players have for many decades been led to believe that the symptoms of early-onset dementia, ALS, loss of memory, headaches, confusion, and the inability to function were not caused by events occurring while they played in the NHL.  And as a result of this willful and malicious conduct, these

former players have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation and other damages.

133.    Only in the past few years, despite decades of previous research, has the NHL reluctantly adopted ineffective rules to protect its players from unnecessary head injuries.  For decades until the present, the NHL has refused to outlaw fighting and all body checking despite significant medical evidence that to do so would substantially reduce the incidence of concussions in professional hockey. Only 28% of the reported concussions in the Cusimano report were the result of a called penalty while 64.2% of the total concussions were caused by body checking.  A legal body check to the other player's body can still result in the checked player's head hitting the ice, boards or glass, resulting in a concussion.

134.    For these reasons, on August 21, 2013, 66% of the delegates at the Canadian Medical Association meeting in Calgary voted to "condemn the complacency of the NHL in regards to violence in hockey."

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth herein.

136.    The class consists of all former NHL players who retired on or before February 14, 2013 and who have suffered brain trauma and/or injuries as a result of concussive and sub-concussive impacts inflicted on them while playing in the NHL.

137.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated individuals pursuant to Fed. R. Civ. P. 23.

138.    The questions of law and fact in this action are uniquely common to all members of the Class.

139.     There are questions of law and fact that are not only common to the Class, but which predominate over any questions affecting only individual Class members.     The predominating questions include, but are not limited to:

- Whether the NHL knew that athletes who sustain repetitive concussive events, sub-concussive events and/or brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities during their hockey careers;

- Whether the NHL should have known that athletes who sustain repetitive concussive events, sub-concussive events and/or brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities during their hockey careers;

- Whether the NHL knew that athletes who sustain repetitive concussive events, sub-concussive events and/or brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities later in life;

- Whether the NHL should have known that athletes who sustain repetitive concussive events, sub-concussive events and/or brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities later in life;

- Whether the NHL assumed a voluntary duty through the creation of its Concussion Program to inform its players of the risks of concussive events, sub-concussive events and/or brain injuries;

- Whether the NHL breached that duty;

- Whether that breach caused Plaintiffs' damages;

- Whether the NHL actively and purposely concealed information from its players regarding the severe risks of concussive events, sub-concussive events and/or brain injuries;

- Whether that active and purposeful concealment caused Plaintiffs' damages;

- Whether the NHL caused or contributed to Plaintiffs' damages by historically ignoring the true risks of concussive events, sub-concussive events and/or brain injuries suffered by NHL hockey players;

- Whether the NHL caused or contributed to Plaintiffs' damages by failing to disclose the true risks of repetitive concussive events, sub-concussive events and/or brain injuries to NHL players;

- Whether the NHL caused or contributed to Plaintiffs' damages by refusing to address the issue of concussive events, sub-concussive events and/or brain injuries despite a growing body of evidence establishing a link between sports and such injuries;

- Whether the NHL caused or contributed to Plaintiffs' damages by refusing to amend its rules and procedures and equipment requirements to effectively protect its players; and

- Whether the NHL's acts and/or omissions were wanton, willful and/or malicious.

140.    Plaintiffs' claims are typical of the claims of the respective Class members.

141.    Plaintiffs/Class Representatives will fairly and adequately protect the interests of the Class.  The interests of the named Plaintiffs and of all other members of the Class are identical and the named Plaintiffs are cognizant of their duties and responsibilities to the Class. Plaintiffs' counsel's combined substantial experience in class action, personal injury and/or professional liability proceedings will adequately represent the Class' interests.

142.    The Class consists of approximately 10,000 individuals and is thus so numerous that joinder of all members is impracticable.

143.    This action should proceed as a class action under Fed. R. Civ. P. 23(b)(1) because separate actions by individual members of the class would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

144.    Alternatively, this action should proceed as a class action under Fed. R. Civ. P. 23(b)(2) because the NHL has acted on grounds that apply generally to the proposed Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

145.     Alternatively, this action should proceed as a class action under Fed. R. Civ. P. 23(b)(3) in that questions of law or fact common to the Class predominate over any questions affecting individual Plaintiffs and class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy between the Class and Defendants.

146.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action but if he does, he may exclude himself from the Class upon the receipt of notice under Fed. R. Civ. P. 23(c).

147.     This class action can be managed without undue difficulty because the Class Representatives will vigorously pursue the interests of the Class by virtue of, and as evidenced by, their actions in initiating this proceeding.

## CAUSES OF ACTION

### COUNT I
### ACTION FOR DECLARATORY RELIEF – LIABILITY

148.     Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

149.     There is a case and controversy among Plaintiffs on the one hand and the NHL on the other.

150.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seeks a declaration as to the following:

a.       that the NHL knew or should have known, at all times material, that the repeated, traumatic and unnecessary head impacts the Plaintiffs endured while playing NHL hockey were likely to expose them to neuro-degenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions;

b.       that based on the NHL's voluntary undertaking to study the issue of MBTI, it had a duty to advise Plaintiffs of that heightened risk;

32

        c.     that the NHL willfully and intentionally concealed from and misled Plaintiffs concerning that risk; and

        d.     that the NHL recklessly endangered Plaintiffs.

### COUNT II
### MEDICAL MONITORING

151.   Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

152.   Plaintiffs experienced repetitive traumatic brain impacts during their respective NHL careers that significantly increased their risk of developing neuro-degenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

153.   Repetitive brain injuries during NHL practices and games has a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau – sometimes over decades – causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

154.   The game of hockey as played in the NHL, including both practices and game play, has exposed former players to hazardous conditions and out-of-the ordinary risks of harm. These repetitive head accelerations to which the Plaintiffs have been exposed present risks of latent but long-term debilitating chronic illnesses not presented to the normal population. Absent Defendants' negligence, fraud, and/or misrepresentations, Plaintiffs' exposure to the risks of

harm as described above (including but not limited to) the release of biological substances into their respective brains would have been materially lower.

155.    Accordingly, the repetitive head impacts sustained by NHL players in games and practices exposed them, including the Plaintiffs, to subtle and repetitive changes within the brain on the cellular level.  For that reason, the environment within which NHL players have sustained repetitive head impacts exposed them to substantive hazards.

156.    Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neuro-cognitive changes over time.

157.    The latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and, sometimes, fully-developed encephalopathy.

158.    Like the organizers of boxing, the NHL, because it permits and promotes on ice fighting, was fully aware of the danger of exposing all NHL players to repetitive head impacts, including the repetitive sub-concussive and concussive blows that increase the risk to NHL players of, among other latent injuries, encephalopathy.

159.    The NHL breached its voluntarily assumed duty to the Plaintiffs by failing to provide NHL players, including the Plaintiffs, with necessary, adequate, and truthful information about the heightened risks of neurological damage that arise from repetitive head impacts during NHL games and practices.

160.    As a proximate result of the NHL's tortious conduct, Plaintiffs have experienced an increased risk of developing serious latent neuro-degenerative disorders and diseases,

including but not limited to CTE, Alzheimer's disease, and/or other and similar cognitive-impairing conditions.

161.    The latent brain injuries from which Plaintiffs suffer require specialized testing (with resultant treatment) that is not generally given to the public at large.

162.    The available monitoring regime is specific for individuals exposed to repetitive head trauma and is different from that normally recommended in the absence of exposure to this risk of harm.

163.    The medical monitoring regime includes, but is not limited to, baseline tests and diagnostic examinations that will assist in diagnosing the adverse health effects associated with hockey-related MBTI. These diagnoses will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs experienced in the NHL.

164.    The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

165.    By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses will be significantly reduced.

166.    By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

167.    Plaintiffs, therefore, seek an injunction creating a Court-supervised, NHL-funded medical monitoring program which will facilitate the diagnosis and adequate treatment of

Plaintiffs for neuro-degenerative disorder or disease.  The medical monitoring should include a trust fund to pay for the medical monitoring and treatment of Plaintiffs as frequently and appropriately as necessary.

168.    Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the continued risk of developing long-term physical and economic losses due to concussions and sub-concussive injuries.  Without Court-approved medical monitoring as described herein, or established by the Court, Plaintiffs will continue to face an unreasonable risk of continued injury and disability.

## COUNT III
## FRAUDULENT MISREPRESENTATION BY CONCEALMENT

169.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

170.    The NHL knew that repetitive head impacts in hockey games and practices created an unreasonable risk of harm to NHL players that was similar or identical to the risk of harm to, for example, boxers who receive repetitive impacts to the head during boxing practices and matches.

171.    The NHL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NHL players are exposed.

172.    During that time, the NHL knowingly and fraudulently concealed from then-current NHL players and former NHL players the risks of head injuries in NHL games and practices, including but not limited to the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

36

173.    From 1997 through June of 2010, the NHL's fraudulent concealment continued. During that time period, the NHL voluntarily funded its Concussion Program but no reports were produced and no rule changes regarding concussions were made and that failure to change and the NHL's silence, except for statements that more data and research were needed, misrepresented to then current and former NHL players and the general public that there is no link (or an insufficient scientific link) between brain injuries in NHL activities and later-in-life cognitive injury, including CTE and its related symptoms.

174.    Given the NHL's superior and unique vantage point, Plaintiffs reasonably looked to the NHL for guidance on head injuries and concussions.

175.    The NHL failed to publish a report or take any action regarding its playing rules or medical protocols, all of which concealed and minimized the risks of repetitive brain impacts.

176.    The NHL knew or should have known that its then-current players, and its former players, would reasonably rely on the NHL's omissions and/or silence on this health issue.

177.    The NHL, therefore, concealed material facts and information and delayed revealing material medical information with the intent to deceive and defraud, which caused Plaintiffs to become exposed to the harm referenced above.  The NHL's concerted concealment of the risks to which the players had been exposed on the ice delayed their ability to plan for the future of themselves and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

178.    The NHL knew and expected that Plaintiffs would rely on its silence, and Plaintiffs in fact did reasonably rely on the silence of the NHL during and after their careers.

179.    The NHL's actions and/or omissions were committed willfully, maliciously, with intent to injure and damage the Plaintiffs, and with reckless disregard of the players' legal rights.

180.    As a direct and proximate result of the NHL's fraudulent conduct, Plaintiffs have suffered physical injury, including but not limited to existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

181.    As a direct and proximate result of the NHL's willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

182.    As a result of the NHL's misconduct as alleged herein, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

### COUNT IV
### FRAUDULENT MISREPRESENTATION BY NONDISCLOSURE

183.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

184.    The NHL knew that repetitive head impacts in hockey games and full-contact practices created a risk of harm to NHL players that was similar or identical to the risk of harm to, for example, boxers who receive repetitive impacts to the head during boxing practices and matches.

185.    The NHL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NHL players are exposed.

186.    During that time period, then-current NHL players and former NHL did not know these facts.   The NHL knew that the players were unaware of these facts, knew that the players would reasonably expect to be told these facts, knew that not disclosing these facts could justifiably induce the players to unreasonably expose themselves to head injuries in NHL games

and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury, and intended to deceive the players.

187.     From 1997 through June of 2010, the NHL continued to withhold these material facts.   During that time period, the NHL voluntarily funded its concussion program but no reports were produced and no rule changes regarding concussions were made and that failure to change and the NHL's silence, except for statements that more data and research were needed, misrepresented to then current and former NHL players and the general public that there is no link (or an insufficient scientific link) between brain injuries in NHL activities and later-in-life cognitive injury, including CTE and its related symptoms.

188.     Given the NHL's superior and unique vantage point, Plaintiffs reasonably looked to the NHL for guidance on head injuries and concussions.

189.     The NHL failed to publish a report or take any action regarding its playing rules or medical protocols, all of which concealed and minimized the risks of repetitive brain impacts.

190.     The NHL knew or should have known that its then-current players, and its former players, would reasonably rely on the NHL's omissions and/or silence on this health issue.

191.     The NHL, therefore, withheld or omitted facts and information and delayed revealing material medical information with the intent to deceive and defraud, which caused Plaintiffs to become exposed to the harm referenced above.   The NHL's concerted omission of the risks to which players had been exposed on the ice delayed their ability to plan for the future of themselves and their families and to seek appropriate treatment of their latent neuro-degenerative conditions.

192.     The NHL knew and expected that Plaintiffs would rely on its silence, and Plaintiffs in fact did reasonably rely on the silence of the NHL during and after their careers.

193.    The NHL's actions and/or omissions were committed willfully, maliciously, with intent to injure and damage the Plaintiffs, and with reckless disregard of the players' legal rights.

194.    As a direct and proximate result of the NHL's fraudulent conduct, Plaintiffs have suffered physical injury, including but not limited to existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

195.    As a direct and proximate result of the NHL's nondisclosure, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

196.    As a result of the NHL's misconduct as alleged herein, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT V
## FRAUD

197.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

198.    The NHL knew or should have known that repetitive head impacts in hockey games and full-contact practices created a risk of harm to NHL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

199.    The NHL knew that the risks of brain injury could be reduced by implementing changes to the game, including but not limited to: (a) continuing to use flexible glass; (b) the active monitoring of players for signs of MTBI; (c) the employment of a neurologist on the sidelines; (d) return-to-play rules consistent with proper medical management of MTBI; (e) requiring doctors, not trainers, to evaluate players off the bench and ice immediately following a

concussive incident; and (f) banning conduct which results in concussive events, sub-concussive events and/or brain injuries, including but not limited to fighting and body checking.

200.    The NHL, however, withheld the information it knew about the risks of head injuries in the game from then-current NHL players and former NHL players and ignored the known risks to all NHL players.

201.    The NHL deliberately delayed implementing the changes to the game it knew could reduce players' exposure to the risk of life-altering head injuries because those changes would be expensive and would reduce its profitability.  The NHL continues to allow and market violence, fighting and body checking, activities proven to increase the incidence of head trauma for its players.

202.    The NHL has or should have been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NHL players are exposed.

203.    The NHL did not timely reveal the information it knew or should have known from medical knowledge available for decades and failed to act, with the exception of mandatory helmets in 1979 and baseline brain testing in 1997.

204.    From 2010 until the present, the NHL's rules and medical protocol changes have been superficial and ineffective in preventing concussions and their resulting injuries.  The NHL's continued refusal to ban fighting and body checking, especially given the medical evidence regarding the high correlation between the rotational acceleration present in such contacts and the incidence of concussions, is a continuing fraudulent action against Plaintiffs and other former NHL players.

205.    Given the NHL's superior and unique vantage point, Plaintiffs reasonably looked to the NHL for guidance on head injuries and concussions.

206.    During that time, the NHL knowingly and fraudulently concealed from then-current NHL players and former NHL players the risks of head injuries in NHL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

207.    The NHL, however, withheld this information from then-current NHL players and former NHL players and ignored the known risks to all NHL players.

208.    During their playing days and after their retirement from the NHL, the Plaintiffs justifiably and reasonably relied on the NHL's omissions and failure to act to their detriment.

209.    The Plaintiffs were damaged by the NHL's misconduct. They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

210.    As a result of the NHL's fraud, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

211.    Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

212.    A special relationship exists between the NHL and the Plaintiffs sufficient to impose a duty on the NHL to disclose accurate information to the Plaintiffs.

213.    The NHL long knew that repetitive head impacts in hockey games and practices created a risk of harm to NHL players that was similar or identical to the risk of harm to boxers

who receive repetitive impacts to the head during boxing practices and matches and football players during games and practices.

214.    The NHL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NHL players were exposed.

215.    The NHL, however, withheld this information from NHL players and ignored the risks to NHL players.

216.    Continuing to the present, the NHL has insisted that more data is needed before any  scientifically  proven  link  between  repetitive  traumatic  head  impacts  and  later-in-life cognitive/brain injury, including CTE and its related symptoms, can be established, a material representation of fact and the current state of medical knowledge.

217.    Defendant NHL, therefore, misrepresented the dangers the Plaintiffs faced in returning to action after sustaining a head injury and the long-term effects of continuing to play hockey after a head injury.

218.    Plaintiffs justifiably relied on the NHL's silence and refusal to act in believing that the long-term risks of permanent harm from playing professional hockey were minimal or non-existent.

219.    Plaintiffs' reliance on the NHL was reasonable, given the NHL's superior and unique vantage point on these issues.

220.    The NHL's silence, its protocol of returning players to the game after an on ice evaluation by a trainer, not a doctor, and its refusal to change any of the rules of play supported the misrepresentations that concussions and long term medical harm resulting from them were not a serious issue for hockey and that present NHL players were not at an increased risk of

short-term and long-term adverse consequences if they returned too soon to an NHL games or practices after suffering head trauma and, therefore, that former players had not been exposed to such increased risk during their time in the NHL.

221.     The NHL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiffs faced serious health problems if they returned to a game too soon after sustaining a concussion.

222.     The NHL knew or should have known the misleading nature of their silence and refusal to act when they decided to do nothing.

223.     The NHL made the misrepresentations and actively concealed information knowing that the Plaintiffs would and did rely on the misrepresentations or omissions in, among other things, how the Plaintiffs addressed the concussive and sub-concussive injuries they sustained.

224.     As a direct and proximate result of the NHL's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium.

225.     As a result of the NHL's misconduct, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT VII
## NEGLIGENCE THROUGH JANUARY 2013

226.     Plaintiffs adopt by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

227.    The NHL voluntarily assumed a duty to provide a reasonably-safe playing and practice environment for Plaintiffs.

228.    The NHL's failure to adequately address the continuing health risks associated with concussive events, sub-concussive events and/or brain injuries that NHL players sustained during this period constituted a breach of its duty to these players, which has resulted in long term neuro-cognitive problems and disabilities to former NHL players, including the Plaintiffs.

229.    During this time, the NHL's continuing perpetration of the dangerous myth that NHL players are tough and can withstand "getting their bell rung," "suffering dings" or temporarily losing consciousness while playing constitutes negligence. The perpetration of misleading and false statements and a philosophy of invincibility nurtured and publicized by the NHL throughout this time constitutes continuing negligent conduct which the NHL has never essentially stopped perpetrating.

230.    The failure of the NHL to publicize within the League, to active players, and to the public at large, including retired players, the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems amongst former players caused then-current players and retired players to believe that their physical and psychological problems (as described herein) were neither serious nor related to hockey.  These acts and/or omissions caused the Plaintiffs to ignore the need for necessary treatment.  Likewise, these omissions and commissions had the institutional effect of reducing the interest in helmet safety research, avoiding changes in rule-playing to minimize head injury, avoiding the need to promulgate rules affecting the return to play rules when concussive events are detected, and establishing programs to educate players about the risks of sub-concussive and concussive long-term risk to their health.

231.     The foregoing behavior of the NHL proximately caused Plaintiffs' injuries and/or damages.

232.     The Plaintiffs have sustained serious injuries and damages as a result of the NHL's negligence.

233.     As a result of the NHL's negligence, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

### PRAYER FOR RELIEF

234.     WHEREFORE, the Plaintiffs pray for judgment as follows:

a.     Declaratory relief requested pursuant to 28 USC § 2201 against the NHL;

b.     Granting an injunction and/or other equitable relief against the NHL and in favor of Plaintiffs for the requested medical monitoring;

c.     Awarding Plaintiffs compensatory damages against the NHL;

d.     Awarding Plaintiffs punitive damages against the NHL;

e.     Awarding Plaintiffs such other relief as may be appropriate; and

f.     Granting Plaintiffs their prejudgment interest, costs and attorneys' fees.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable in this Complaint.

Date: November 25, 2013

SILVERMAN THOMPSON SLUTKIN & WHITE, LLC

By:_____/s/_____
Andrew G. Slutkin (DC Bar # 433818)
aslutkin@mdattorney.com
Andrew C. White (DC Bar # MD08821)
awhite@mdattorney.com
William N. Sinclair (DC Bar # 500799)
bsinclair@mdattorney.com
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201
Telephone:     (410) 385-2225
Telecopier:    (410) 547-2432

Steven D. Silverman (*Pro Hac Vice* Pending)
ssilverman@mdattorney.com
Joseph F. Murphy, Jr. (*Pro Hac Vice* Pending)
josephmurphy@mdattorney.com
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201
Telephone:     (410) 385-2225

*Attorneys for Plaintiffs*